ALVIA BAIR, Appellant, v. WILLIAM SCHULTZ, Appellee.

No. 44541.

194

[redacted]

October 24, 1939.

[redacted]

M. W. Stapleton and Thompson & Thompson, for appellant.
Harold E. Wilson, for appellee.

Stiger, J.—Plaintiff alleged that defendant with malicious intent and without probable cause procured an indictment against him charging that he stole "certain slabs in excess of the value of $20.00" from defendant. He asked for actual and exemplary damages.

Defendant pleaded a general denial. He further pleaded that he made a full, fair and complete disclosure to the county attorney of the facts he testified to before the grand jury and that the county attorney thereupon advised him to place his testimony before the grand jury, and relying thereon, and acting under advice of counsel, he testified before the grand jury; that he had reasonable cause to believe that the facts to which

he testified were true and that in giving his testimony he acted in good faith, without malice and with probable cause.

After his indictment for the felony, plaintiff was arrested and released on bond.

The indictment was returned on January 8, 1936, and on January 17, 1936, the county attorney dismissed the cause for lack of evidence with the approval of the court.

The burden of proof was on plaintiff to show (1) the previous prosecution; (2) the instigation or procurement thereof by the defendant; (3) the termination thereof by the acquittal or discharge of the plaintiff; (4) want of probable cause; and (5) that the prosecution was malicious. It is conceded that there was a previous prosecution and that the prosecution was terminated by the dismissal of the indictment and discharge of the plaintiff.

In 1935, Byron Layton, engaged in construction work, entered into a contract with defendant, William Schultz, for the purchase of timber on defendant's land for dimension lumber. Layton employed William Furnas to furnish his sawmill and employed plaintiff to furnish his engine to operate the mill. In producing dimension lumber, there are by-products known as side lumber, slabs and off-falls. It is undisputed that Layton purchased only the dimension lumber and side lumber from defendant, the latter reserving the right to repurchase the side lumber from Layton at cost. The controversy in this case had its origin in a dispute between plaintiff and defendant over the ownership of the slabs. Furnas also claimed an interest in the slabs.

The first issue is the alleged instigation or procurement of the prosecution of plaintiff by defendant.

Mr. Weaver, county attorney, testified substantially as follows:

"William Schultz in 1935 informed me of a disagreement he had had over a load of slabs with a young man by the name of Bair. There was some question as to the ownership. The complaint was discussed from the standpoint of larceny. Schultz claimed he was the absolute owner of the slabs and that they were worth more than $20.00. I afterwards found both statements were questionable. The substance of his complaint was that Bair took the slabs without his consent. The only knowl-

edge I had as to whether Bair had committed larceny was the statement Schultz made to me. After Schultz complained to me that Bair had committed larceny, I do not remember that I made any statement to him that the facts stated to me constituted the crime of larceny. I attempted to see if a peaceful settlement could be worked out. I called up Byron Layton in Muscatine, but he couldn't give me any light on the ownership of the slabs. There was a question in my mind about proving ownership and the value of the slabs. Schultz made a second trip to my office in regard to his complaint before the meeting of the grand jury in 1936. I do not remember him bringing in witnesses to talk to me. I finally informed him of the time the grand jury would meet and told him that he could appear. Schultz appeared when the grand jury convened. The names of other witnesses who appeared were given to me by Schultz. I made no recommendation to the grand jury that there was sufficient evidence to convict. They indicted this man. After the indictment was returned, I made an investigation as to the evidence in the case. After that investigation was made, based upon what I found, I concluded that the indictment could not be supported by sufficient evidence and dismissed the case.''

The defendant testified:

''After I had related to the county attorney what I found from my investigation, he said I could appear before the grand jury and relate my case. He took the names of other witnesses who knew about the transaction. Mr. Weaver called me on the telephone and told me when the grand jury would meet and if I cared to I could come down. I told the grand jury the truth just as I had found it from my investigation. In my conversation with Mr. Plumb and plaintiff at the mill, I learned that the slabs by universal custom went to the sawmill and when I went to Mr. Weaver, the county attorney, to lay my complaint before him I knew of this custom. I didn't tell Mr. Weaver about the custom that the slabs went with the mill.''

William Furnas testified that Schultz solicited him to appear before the grand jury.

In the case of Dickson v. Young, 208 Iowa 1, loc. cit. 7, 221 N. W. 820, loc. cit. 823, the court states:

"Was the prosecution in this case instituted by the appellee? What and all he did was to sign the information, at the request of the district attorney. The district attorney, whose duty it was to prosecute offenses coming within his jurisdiction, after a careful and painstaking investigation, in good faith, had decided that the prosecution was justified and proper. Thus convinced, he had a perfect right to proceed in the manner adopted. Appellee was under no particular duty to grant the request of the district attorney and sign the information; but if, under the same circumstances, he had consulted the district attorney, and in good faith laid before him all of the facts, and had acted upon his advice and signed the information, he would not have been liable for damages. So far as the matter of good faith is involved, it would seem as though he should be excused from liability as well in the one case as in the other. The precise question has not previously arisen in this state; but in other jurisdictions it has been held that, in such circumstances, the prosecution is deemed to have been commenced by the prosecuting attorney. All of the instrumentalities necessary for placing the law in motion had been arranged and were under the control and direction of the public prosecutor."

In the instant case, the county attorney did not make an independent investigation of the facts and then request defendant to proceed with the prosecution. After the indictment was returned, he made a careful investigation of the facts and concluded there was not sufficient evidence to sustain the charge. The county attorney had a serious doubt about the ownership of the property and all that he did was to advise the defendant that "if he cared to he could appear before the grand jury." Mr. Weaver made no recommendation to the grand jury. Whether defendant set the machinery of the criminal law in motion was at least a jury question.

[3]  The material evidence on the question of probable cause offered by plaintiff is as follows: Plaintiff, who furnished the engine, testified Layton agreed to pay him $4.00 per thousand feet and to give him the slabs. He told Layton that he would have to have the slabs for fuel and further stated to him that it was the custom that the slabs went with the sawmill outfit. During the second week that he was operating his engine on defendant's land, defendant told him he was going to start hauling the slabs

home. Plaintiff replied: "Mr. Schultz, I might just as well tell you first as last, those slabs belong to me," and Schultz replied, "well, if that is the case, that settles it." Plaintiff then stated: "There is Mr. Layton standing over there at the head of the mill, you can go over and talk to him and see if it isn't just as I told you." Schultz did not go over to see Layton at that time.

John Young, who helped plaintiff operate the engine, was present at the above conversation between plaintiff and defendant and corroborated plaintiff's testimony.

William Nickerson, an experienced sawmill operator, testified he introduced Layton to Bair, telling plaintiff that Layton wanted to hire him to furnish power for the mill; that Layton agreed that he would pay Bair $4.00 per thousand and give him all the slabs. Nickerson, Young and Brown, all sawmill operators, testified that the universal custom was that the slabs always belonged to the sawmill; that if the engine was furnished by one man and the saw by another, the slabs went to the person who owned the engine, the custom reserving the slabs to him for fuel.

Furnas, a witness for the defendant, testified that, under such circumstances, the custom was that one half of the slabs belonged to the millowner and one half to the owner of the engine.

Plaintiff sold the slabs to Joe Phillips. Phillips reported to plaintiff that defendant told him not to move the slabs from his land. Thereupon, plaintiff went to the home of defendant and testified to the following conversation with defendant:

"I asked Mr. Schultz if he told Phillips not to move the slabs. Schultz said he did. I asked him why he did it and he said that Mr. Layton had given him the slabs. I said, 'Well, you get in the car and I will take you up to Layton.' And he wouldn't go. He said, 'No, I won't go.'"

Plaintiff then told Layton that Schultz had stopped Phillips from going on the land and removing the slabs, and Layton replied, "why don't you go down there and bring those slabs out of there?" Plaintiff, at Phillips request, hauled the slabs from defendant's land for Phillips, receiving $10 for the work.

Layton, a witness for plaintiff, testified with regard to his

contract with Bair, "I think there was something said with respect to the slabs from the sawing. My reply to Bair was that I assumed that he would be granted the privilege of using such slabs as were necessary to fire his engine. I did not know at that time as a matter of law or fact where the slabs would go. I only purchased the dimension lumber. I had nothing to do with the slabs. My impression was the slabs and off-falls would go to the owner of the land. I wasn't in a position to permit Schultz to take the slabs. I don't recall of telling Schultz in any conversation that he could have the slabs. I don't know what the agreement was between Furnas, owner of the mill, and Bair, the man who furnished the power. I never told Bair that he could not have any more slabs than were necessary to fire the engine. I had no agreement with Schultz in regard to the slabs."

The following testimony, material to the issue of probable cause, was introduced by defendant: Preston, who helped Bair operate the engine, testified that Layton told plaintiff he could have all the slabs he wanted for power. Defendant testified Layton agreed he could have the slabs.

Defendant admits that plaintiff told him he owned the slabs and that Layton gave them to him. He heard that Phillips had bought the slabs from Bair and told Phillips that they were his slabs and not to haul them. He admits that plaintiff came to his house and told him that he owned the slabs because Layton had given them to him, and had sold them to Phillips. He stated Layton orally agreed to give him the slabs. Defendant then testified: "I knew only by what Bair told me—that he was making an honest claim to the ownership of the slabs. I remember on Sunday afternoon, Mr. Bair drove to my farm with four men in the car. He again told me of his ownership of the slabs."

"I told the county attorney that I was the owner of the slabs and plaintiff had taken the slabs without my consent. I knew of the universal custom that the slabs went to the sawmill operators and did not tell the county attorney of this custom."

Prior to complaining to the county attorney, defendant knew of the custom. He had talked with Furnas about the slabs. He knew that Furnas claimed an interest in this prop-

erty. He knew that plaintiff claimed to own the slabs under an arrangement with Layton; that Bair was making "an honest claim to the ownership of the slabs." He knew plaintiff had sold the slabs to Phillips under his claim of ownership. There is substantial evidence that plaintiff, in good faith, believed he was the owner.

We have often defined probable cause as "the knowledge by the prosecuting witness of such a state of facts as would lead a man of ordinary caution and prudence, acting conscientiously, impartially, reasonably, and without prejudice, to believe that the person accused is guilty. The question of probable cause may be one of law or one of fact. If the evidence shows conclusively that the prosecution was begun with probable cause, the question is one of law, and a verdict should be directed for the defendant." Hepker v. Schmickle, 209 Iowa 744, 747, 229 N. W. 177, 179; Dickson v. Young, 208 Iowa 1, 221 N. W. 820; Knapp v. Chicago B. & Q. R. Co., 113 Iowa 532, 85 N. W. 769; Shaul v. Brown, 28 Iowa 37, 4 Am. Rep. 151; Center v. Spring, 2 Iowa 393.

Except where the evidence is so clear and undisputed that all reasonable minds must reach the same conclusion therefrom, the question whether there is or is not probable cause must be determined by the jury. Gripp v. Crittenden, 223 Iowa 240, 271 N. W. 599; Wilson v. Thurlow, 156 Iowa 656, 137 N. W. 956; Krehbiel v. Henkle, 142 Iowa 677, 121 N. W. 378.

On this record, the question whether defendant had probable cause for honestly believing that plaintiff was guilty of the crime of larceny was for the jury.

█ Defendant pleads that he made a full, fair and complete disclosure to the county attorney of all the facts and circumstances within his knowledge; that the county attorney advised him that he should give the testimony to the grand jury and in testifying before the grand jury he was acting under the advice of the county attorney.

Assuming he was advised by Mr. Weaver to prosecute the criminal case, he must show he acted on the advice in good faith and in the honest belief that plaintiff was guilty of larceny.

In the case of Wilson v. Thurlow, 156 Iowa 656, loc. cit. 658, 137 N. W. 956, loc. cit. 957, we stated:

"Whether defendant in good faith acted on the advice of the county attorney is generally a question for the jury. White v. Textbook Co., 144 Iowa 92, 121 N. W. 1104. Advice of an attorney to constitute a good defense must be based on a full and fair statement of the facts within defendant's knowledge, and the advice must have been acted on in good faith and with the belief that there was good cause for the prosecution, and whether or not these things were done is a jury question." See Gripp v. Crittenden, 223 Iowa 240, 271 N. W. 599; Granteer v. Thompson, 207 Iowa 1204, 224 N. W. 528; Dickson v. Young, 208 Iowa 1, 221 N. W. 820; Wilson v. Lapham, 196 Iowa 745, 195 N. W. 235.

Defendant told the county attorney that he was the absolute owner of the slabs and plaintiff took them without his consent.

He neglected to tell him that plaintiff claimed ownership under the contract with Layton.

He concealed from the county attorney his knowledge of the custom under which Bair would have a right to one half of the slabs and Furnas, the millowner, a right to the remaining one half. He did not disclose that he had talked with Furnas about the slabs.

In Center v. Spring, 2 Iowa 393, loc. cit. 405, the court states:

"To say that 'if defendant acted under the advice of counsel, *malice* cannot be inferred from the want of *probable cause*,' without qualification or limitation, is not correct. He may have misrepresented the facts; he may not have acted *bona fide*, under the counsel given, or he may himself have known or believed, that there was no cause for the prosecution; and if so, he would not be protected; and malice might be inferred from the want of probable cause, though he did act under the advice of counsel."

If full disclosure had been made, it is quite probable the county attorney, in the light of his subsequent discharge of plaintiff, would have told the grand jury that there was not sufficient evidence to justify an indictment.

It cannot be said that defendant established his defense with the conclusiveness that will sustain a directed verdict.

202

Defendant, in his testimony before the grand jury, testified, "through my conversations with Alvia Bair, who was furnishing the power for the sawmill, I found out he was claiming the slabs. After this I talked to Layton and it was our understanding of the agreement that the slabs belonged to me. I know that Bair sold what he alleged to be his slabs to Joe Phillips. Bair and Phillips hauled the slabs out of my timber and forbid me from getting any of the slabs for my own use. It has always been my understanding that these slabs belonged to me."

His testimony before the grand jury of facts within his knowledge was as incomplete as his disclosure to the county attorney.

The question of malice, which may be inferred from want of probable cause, should also have been submitted to the jury.

The court erred in sustaining defendant's motion for directed verdict.—Reversed.

OLIVER, C. J., and SAGER, RICHARDS, and BLISS, JJ., concur.